IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **A BLACK MOTOROLA CELL PHONE, IMEI UNKNOWN,** CURRENTLY LOCATED AT THE DEA MEMPHIS RESIDENT OFFICE, 50, NORTH FRONT ST. MEMPHIS, TN 38103 | Case No. 23-SW-017<br><br>FILED UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Brittni L Vick, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I, Task Force Officer B. Vick, duly sworn, depose and say, I am a Task Force Officer with the United States Drug Enforcement Administration (DEA) and have been so since July of 2022. I am currently assigned to DEA's Memphis, Tennessee Resident Office (RO), a component of DEA's Louisville Field Division.

3. Prior to my assignment as a Task Force Officer with the DEA, I served as a police officer with the City of Bartlett, Tennessee. I have worked for the Bartlett Police Department for over five years, beginning in November of 2017.

4. During my career as a police officer with the Bartlett Police Department and as a Task Force Officer with the DEA, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics investigations, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The property to be searched is a **BLACK MOTOROLA CELLPHONE, IMEI # UNKNOWN**, pictured in attachment A, hereinafter the "Device." The Device is currently located at the DEA Memphis Resident Office, 50 N. Front St. Memphis, TN 38103.

7. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. Based upon my knowledge, training, and experience and my knowledge of this investigation, I believe that the cellular devices contains evidence of 21 U.S.C §§ 841(a)(a) and 846 and 18 U.S.C. 1956 and 1957.

9. Juan COVARRUBIAS is a Mexican National. His most recent crossing history shows that he entered the United States on November 11, 2022 and November 12, 2022.

10. On Monday November 14, 2022 West Tennessee Drug Task Force Agents Frank Bell and Sean Carlson were working at the Greyhound bus station (3033 Airways Blvd, Memphis, Tennessee). At approximately 8:45 a.m., Agents Bell and Carlson made contact with the inbound Greyhound bus from Oklahoma City (bus #86579). Agent Bell then boarded the bus and spoke to all passengers identifying himself as an Agent for the West Tennessee Drug Task Force (WTDTF), and that he and his partner, Agent Carlson, will be conducting consensual interviews after the passengers exit the bus. After exiting the bus, Agents Bell and Carlson observed a male passenger exit the bus, later identified as Juan COVARRUBIAS, wearing a green camo backpack. After exiting the bus, COVARRUBIAS immediately stopped walking as if he was frozen and could not move. For approximately a few seconds, COVARRUBIAS looked at both Agents, and then began walking towards Agent Bell. Agent Bell asked COVARRUBIAS, "How are you doing today?" to which he replied "Good". Agent Bell then asked COVARRUBIAS where he was traveling to and he replied, "North Carolina". Agent bell asked him if he was carrying narcotics or weapons in his backpack to which he replied "No". Agent Bell asked COVARRUBIAS for consent to search his backpack, and he replied "Yes". Agent Bell searched the backpack worn by COVARRUBIAS. Agent Bell observed one gray shirt, black socks, one pair of blue jeans, and two brown bricks wrapped in mailing tape.

Agents have seen this type of packaging numerous times in the past covering and masking the odor of illegal narcotics. Agent Bell then asked him what was inside the packages. COVARRUBIAS stated, "I don't know. It's not mine". Agents then detained COVARRUBIAS and cut one of the packages open. Inside the layers of tape, plastic, and carbon paper, Agents observed a purple powdery substance. Agent Bell then advised COVARRUBIAS of his Miranda Rights in English, and allowed him to read his Miranda Rights in Spanish as well. Agents Bell and Carlson then transported him to the WTDTF Office at 1111 Mullins Station Rd for further investigation.

~~11.~~  Agents Bell and Carlson opened and tested both packages. The first package contained three separate heat-sealed vacuum bags wrapped with black carbon paper around each package. Agents observed one of the aforementioned packages to contain a hard purple powder substance which field tested presumptive positive for fentanyl weighing approximately one pound. The second package contained a hard white powder substance which field tested presumptive positive for fentanyl weighing approximately one pound. The total gross weight of the two packages was 2,903.7 grams. Also inside the second package was a heat sealed vacuum bag containing a large number of blue suspected fentanyl pills with the letter "M" embossed on each pill. The package of pills weighed approximately one half pound.

12. At approximately 10:30 a.m. Task Force Officers (TFOs), Dion Cicinelli, Tyler Huelsing, and Brittni Vick with the Drug Enforcement Administration's Memphis Resident Office arrived at 1111 Mullins Station Dr. Memphis, TN 38134.

13. Members of the West Tennessee Drug Task Force transported Juan Antonio COVARRUBIAS to the Shelby County Criminal Justice Complex where he was booked for Possession of Schedule I (Fentanyl) with Intent to Manufacture, Deliver, or Sale. TFOs Dion

4

Cicinelli, Tyler Huelsing, and Brittni Vick took possession of the Device the black Motorola (Unknown IMEI), as evidence. West Tennessee Drug Task Force Agent Bell located the device inside the backpack worn by COVARRUBIAS during the course of the search.

14. The Device is currently in the lawful possession of the Drug Enforcement Administration via the West Tennessee Drug Task Force. It came into the Drug Enforcement Administration's possession as stated herein, seized incident to arrest on November 14, 2022. Therefore, while the Drug Enforcement Administration might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

15. The Device is currently in storage in a West Tennessee Drug Task Force Evidence Locker at the Drug Enforcement Administration (DEA) Memphis Resident Office, 50 N. Front St. Memphis, TN 38103. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Drug Enforcement Administration/ West Tennessee Drug Task Force.

16. Your affiant knows that individuals involved in narcotics trafficking often ~~utilizing~~ utilize cell phones such as the Device to facilitate drug trafficking. For example, the Device could contain electronic communications with co-conspirators regarding the narcotics transportation, addresses indicating the origin and/or destination of the narcotics, and the names or phone numbers that could further identify co-conspirators.

17. Further, in previous investigations, I, along with other law enforcement officers have seized multiple cellular devices from individuals and searched them for evidence. In these

instances, the cellular devices contained evidence of fruits and instrumentality of the alleged crimes, to include text messages pertaining to the sale of narcotics and possession of firearms, call logs, connections to social media accounts, and photographs of narcotics and firearms

## TECHNICAL TERMS

18. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

19. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.motorola.com. I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

21. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*[signature]*
Brittni Vick
Task Force Officer
Drug Enforcement Administration

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [ ] telephone or [ ] other reliable electronic means or [X] both, in reviewing and deciding whether to issue a search warrant. In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [X] that the signatures on the search warrant application and affidavit are those of the affiant or [ ] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the search warrant application and affidavit are true and correct to the best of the affiant's knowledge.

Subscribed and sworn to before me on January 17, 2023:

_____
Honorable Annie T. Christoff
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TENNESSEE